**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1669**

MARIA SUYAPA VELASQUEZ; D.A.E.V., minor child,

Petitioners,

v.

JEFFERSON B. SESSIONS III, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 9, 2017                                   Decided: July 31, 2017

Before WILKINSON, TRAXLER, and AGEE, Circuit Judges.

Petition denied by published opinion. Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Traxler concurred. Judge Wilkinson filed a separate concurring opinion.

**ARGUED:** David John Kline, Alexandria, Virginia, for Petitioners. Gregory Darrell Mack, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Bridget Cambria, Jacquelyn Kline, CAMBRIA & KLINE, Reading, Pennsylvania, for Petitioners. Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Terri J. Scadron, Assistant Director, Civil Division, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

AGEE, Circuit Judge:

Maria Suyapa Velasquez, a citizen and native of Honduras, entered the United States unlawfully in 2014 with her minor son D.A.E.V.; they were detained by U.S. Customs and Border Patrol at the time of entry. The Government issued a Notice to Appear, charging Velasquez and D.A.E.V. with removability under section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (the "INA"). *See generally* 8 U.S.C. § 1182(a)(7)(A)(i)(I). Velasquez conceded her removability, but applied for asylum and withholding of removal, and attached D.A.E.V. as a rider on her petition.[1] An Immigration Judge ("IJ") rejected her claims, and a single-member panel of the Board of Immigration Appeals (the "BIA" or "Board") dismissed her appeal. Velasquez now petitions this Court for review. For the reasons that follow, we deny the petition.

I.

A.

We recount the facts set out in the record, which are not disputed.

Velasquez and D.A.E.V. fled Honduras because the mother of D.A.E.V.'s late father, Maria Estrada, demanded custody of D.A.E.V. For nearly a decade, Estrada implored Velasquez to turn D.A.E.V. over to her, but each time Estrada made such a

---

[1] Velasquez also applied for relief under the United Nations Convention Against Torture. An Immigration Judge denied that claim, and Velasquez does not pursue it in her petition for review. Accordingly, she has abandoned that claim. *See Karimi v. Holder*, 715 F.3d 561, 565 n.2 (4th Cir. 2013).

2

request Velasquez denied it. In 2013, Estrada's attempts to take custody of D.A.E.V. became more forceful. On more than one occasion, Estrada kidnapped D.A.E.V. from Velasquez' home while Velasquez was away. Each time, D.A.E.V. escaped and walked back home. Shortly before Velasquez fled Honduras, Estrada began threatening to kill Velasquez if she did not relinquish custody of D.A.E.V. to her.

The escalating tension between Velasquez and Estrada prompted Velasquez to relocate to the United States. In April 2014, Velasquez and D.A.E.V. unlawfully crossed the United States' border with Mexico and were detained shortly after. While detained, Velasquez' mother communicated to her that Estrada's son Oscar (D.A.E.V.'s uncle) murdered Velasquez' sister. The murder, according to Velasquez' mother, was a case of mistaken identity: Oscar believed his victim was Velasquez.

B.

The Government issued Velasquez a Notice to Appear and charged her with being removable under section 212 of the INA. Velasquez conceded her removability, but argued she was a "refugee," entitled to either asylum or withholding of removal under sections 208 and 241 of the INA. *See generally* 8 U.S.C. § 1158(b)(1)(A) (setting standard for asylum); *id.* § 1231(b)(3) (setting standard for withholding of removal); *see also generally id.* § 1101(a)(42)(A) (defining "refugee"). Velasquez based her petition for asylum and withholding of removal on alleged persecution "on account of" her membership in a "particular social group," which she contended was her nuclear family. *See* 8 U.S.C. §§ 1101(a)(42). She claimed D.A.E.V. as a derivative beneficiary on her

3

petition for asylum under INA section 208(b)(3)(A). *See generally* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.21.[2]

Velasquez' petition for asylum and withholding of removal was heard by an IJ, who denied the petition on both bases. First, the IJ found that Velasquez was not entitled to asylum because the dispute between Velasquez and Estrada was not "on account of" Velasquez' membership in her claimed particular social group, her nuclear family, but rather was "an intra-family custody dispute over" D.A.E.V. A.R. 93. In particular, the IJ held that Velasquez "failed to proffer evidence that the motivation for the conduct of the Estrada family was to persecute [her] on account of her family membership." A.R. 93. It observed, for example, that Oscar had killed Velasquez' sister "in the presence of [her] mother, who remained untargeted and intact" and that Velasquez' "four other children [by a different father] remain in Honduras and are unharmed." A.R. 93. Because the IJ denied Velasquez' application for asylum, it necessarily also denied D.A.E.V.'s derivative claim. In addition, because withholding of removal employs a more stringent standard than asylum, it held Velasquez could not meet her burden of proof as to withholding of removal. *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004) ("[A]n applicant who is ineligible for asylum is necessarily ineligible for withholding of removal."). *Compare* 8 U.S.C. § 1231(b)(3)(A) (providing that an alien *cannot* be

---

[2] Velasquez did not, and could not, claim D.A.E.V. as a derivative beneficiary on her withholding of removal petition. *See Niang v. Gonzales*, 492 F.3d 505, 513 (4th Cir. 2007) ("[T]he statute permitting withholding of removal does not encompass derivative withholding claims, that is, claims for withholding of removal based on persecution to another person; instead, an alien seeking withholding of removal must established that *they* will suffer harm if removed.").

4

removed if she demonstrates that her "life or freedom would be threatened" because of her "membership in a particular social group"), *with* 8 U.S.C. § 1158(b)(1) (stating that an alien *may* be granted asylum if she can demonstrate that membership in a particular social group "was or will be at least one central reason" for persecution in her native country).

Velasquez timely appealed the IJ's adverse decision to the Board, which dismissed her appeal in a single-member decision. The Board adopted and supplemented the IJ's reasoning, stating: "The [IJ's] finding that the criminal acts committed by [Velasquez'] deceased husband's family against [her] d[id] not constitute persecution on account of a statutorily protected ground is not clearly erroneous inasmuch as the record supports the finding that [Velasquez] was targeted due to a personal dispute over who should have custody of [D.A.E.V.]." A.R. 437. The Board reiterated the IJ's conclusion that "the current facts involve a dispute over a personal matter within the family." A.R. 437.

Velasquez timely petitioned this Court for review of the Board's decision. We have jurisdiction to consider her petition under section 242 of the INA. *See generally* 8 U.S.C. § 1252.

## II.

"The decisions of the BIA concerning asylum eligibility or withholding of removal are deemed conclusive if supported by reasonable, substantial and probative evidence on the record considered as a whole." *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 448 (4th Cir. 2007) (internal quotation marks omitted). "Where[, as here,] the BIA

5

has adopted and supplemented an IJ's decision, [the Court] review[s] both rulings and accord[s] them appropriate deference." *Cervantes v. Holder*, 597 F.3d 229, 232 (4th Cir. 2010). We review the IJ's findings of fact for substantial evidence; we must affirm unless the record would compel "any reasonable adjudicator . . . to conclude to the contrary." *Djadjou v. Holder*, 662 F.3d 265, 273 (4th Cir. 2011). We review legal issues de novo. *Id.*

### III.

In her petition for review, Velasquez[3] argues that the BIA erred as a matter of law in concluding that she was not a "refugee" entitled to asylum in light of Estrada's actions.

### A.

Velasquez is entitled to asylum only if she is a "refugee," as the INA defines that term. *See* 8 U.S.C. § 1158(b)(1)(A). A "refugee" is an alien outside the country of her nationality "who is unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). The asylum-seeker bears the burden of demonstrating her refugee status. *Id.* § 1158(b)(1)(B)(i).

To do so, Velasquez must demonstrate: (1) she "has a well-founded fear of persecution"; (2) her fear arises "on account of" membership in a protected social group;

---

[3] Because D.A.E.V. is a rider on Velasquez' petition for asylum, we need only examine her arguments.

and (3) the threat is made by an organization that the Honduran government "is unable or unwilling to control." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948–49 (4th Cir. 2015). The parties here address only the second prong: whether Estrada's prosecution of Velasquez arose "on account of" Velasquez' membership in a particular social group, her nuclear family.[4] We have recognized that an individual's membership in her nuclear family is a particular social group. *Id.* at 949 ("[M]embership in a nuclear family qualifies as a protected ground for asylum purposes.").

To satisfy the second prong, Velasquez must show that her membership in her nuclear family "was or will be at least one central reason for" her persecution. 8 U.S.C. § 1158(b)(1)(B)(i). She "need not show that h[er] family ties provide the central reason or even a dominant central reason for h[er] persecution." *Hernandez-Avalos*, 784 F.3d at 949 (internal quotation marks omitted). Rather, she "must demonstrate [only] that these ties are more than an incidental, tangential, superficial, or subordinate reason for h[er] persecution." *Id.*

## B.

Velasquez contends both the IJ and the Board erred in characterizing her dispute as a personal one that it is not protected rather than one "on account of" her membership in her nuclear family, which would be protected. "[A]liens with a well-founded fear of

---

[4] The IJ did not address the third prong, but resolved the case under the protected social group aspect. Velasquez never pursued the third prong before the IJ or BIA, and we, therefore, lack jurisdiction to consider it at this juncture. *See Cordova v. Holder*, 759 F.3d 332, 336 n.2 (4th Cir. 2014) (noting that where a petitioner failed to press a claim before the BIA, we "lack jurisdiction to review" it).

persecution supported by concrete facts are not eligible for asylum if those facts indicate only that the alien fears retribution over purely personal matters . . . ." *Huaman-Cornelio v. Bd. of Immigration Appeals*, 979 F.2d 995, 1000 (4th Cir. 1992); *accord Jun Ying Wang v. Gonzales*, 445 F.3d 993, 998–99 (7th Cir. 2006) (stating "[t]his circuit and others, however, have repeatedly held that a personal dispute cannot give rise to a claim for asylum"; collecting cases). "[E]very threat that references a family member is [not] made on account of family ties." *Hernandez-Avalos*, 784 F.3d at 950 n.7.

Substantial evidence in the record supports the IJ's factual conclusion that this case is solely one of personal conflict among family members: Velasquez and her mother-in-law. Most pointedly, Velasquez' trial testimony proves this point: no one besides Velasquez, her mother-in-law, and brother-in-law were involved. For example, upon cross examination Velasquez testified as follows:

> [Q:] Is anybody else outside of these two families involved in this disagreement?
>
> [A:] No
>
> [Q:] Are you afraid of anybody else in Honduras taking your son, besides this family?
>
> [A:] No.

A.R. 165–66. Upon redirect examination, she confirmed that "[t]he disagreement has been with her and me." A.R. 167.

In that circumstance, "[e]vidence consistent with acts of private violence or that merely shows that an individual has been the victim of criminal activity does not constitute evidence of persecution on a statutorily protected ground." *Sanchez v. U.S.*

8

*Att'y General*, 392 F.3d 434, 438 (11th Cir. 2004). We must view the facts "holistically, with an eye to the full factual context." *Oliva v. Lynch*, 807 F.3d 53, 60 (4th Cir. 2015). Viewed through that lens, Estrada's threats were motivated not by Velasquez' family status but by a personal desire to obtain custody over D.A.E.V. Velasquez testified that "[t]he disagreement [between myself and Estrada] is that [Estrada] does not want me to have [D.A.E.V.]. She wants to have him." A.R. 165.

Nevertheless, Velasquez contends that our decision in *Hernandez-Avalos* required the IJ to find that the dispute between herself and Estrada was "on account of" her status as a member of her nuclear family. We disagree. Were we to credit Velasquez' understanding of *Hernandez-Avalos*, we would transform every intra-family dispute into a case for asylum.

In *Hernandez-Avalos* we held that threats made by a gang and directed at the petitioner were made "on account of" her membership in her nuclear family, where gang members tried to have her persuade her son to join the gang. Five members of the El Salvadorian gang "Mara 18" approached the petitioner and demanded that she allow her son to join the gang. 784 F.3d at 947. When the petitioner refused, one of the gang members "put a gun to her head and told her that if she opposed her son's joining them" that she would die. *Id.* Later, the gang members returned, demanded the petitioner let her son join the gang, and gave her "one day to turn her son over to the gang or she would be killed." *Id.* On those facts, the BIA concluded that the petitioner had not been persecuted "on account of" her family membership. We reversed and concluded that "Mara 18 threatened [the petitioner] in order to recruit her son into their ranks, but they

9

also threatened [her], rather than another person, because of her family connection to her son." *Id.* at 950. Continuing, we noted the "threats that directed [the petitioner] to turn her son over to the gang were meaningful only because of her maternal authority over her son's actions, and there is no evidence that she would have been selected as the recipient of those threats absent that familial connection." *Id.* at 950 n.7.

Although the familial relationships at issue in *Hernandez-Avalos* and the present case involve a mother's relationship with her son, this case is unlike *Hernandez-Avalos* in critical respects. In *Hernandez-Avalos,* a non-familial third party persecuted the petitioner because of her family association for the purpose of gang recruitment. In contrast, Velasquez had a long-standing personal disagreement with Estrada over a solely personal conflict regarding D.A.E.V. Estrada's persecution of Velasquez was only between the two of them—that is, merely incidental to Estrada's desire to obtain custody of D.A.E.V.[5] "[T]he asylum statute was not intended as a panacea for the numerous personal altercations that invariably characterize economic and social relationships." *Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005). Because Estrada was motivated out of her antipathy toward Velasquez and desire to obtain custody over D.A.E.V., and not by Velasquez' family status, *Hernandez-Avalos* does not provide the rule here. The IJ and BIA appropriately concluded that Estrada's motive was not

---

[5] Nor, as Velasquez suggests, does *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014), control. There, the BIA considered whether "married women in Guatemala who are unable to leave their relationship" constituted a cognizable particular social group for asylum relief. *Id.* at 392. The legal validity of the social group identified by Velasquez is not at issue in this case. Moreover, *A-R-C-G* does not bear on our nexus analysis because, there, the Government "concede[d] . . . that the mistreatment [suffered by the alien] was, at for at least one central reason, on account of her membership in a cognizable particular social group." *Id.* at 395.

10

Velasquez' familial status, but simply a personal conflict between two family members seeking custody of the same family member. That factual conclusion is fully supported by the record and not clearly erroneous. *Abdel-Rahman*, 493 F.3d at 448 ("The decision[] of the BIA concerning asylum . . . [is] deemed conclusive if supported by reasonable, substantial and probative evidence on the record considered as a whole." (internal quotation marks omitted)). Thus, substantial evidence supports the IJ's conclusion that Velasquez simply failed to show that family status was a reason, central or otherwise, for her difficulties. *See Hernandez-Avalos*, 784 F.3d at 949.

For similar reasons, this case also is unlike the recent decision in *Cruz v. Sessions*, 853 F.3d 122 (4th Cir. 2017). In *Cruz*, the petitioner, a Honduran national, applied for asylum based on her membership in a "particular social group," namely the "nuclear family of [her husband,] Johnny Martinez." *Id.* at 124–25. Martinez had been killed by his boss, who worked closely with organized crime groups, ostensibly after Martinez had discovered his boss' illicit business and tried to go to authorities. *See id.* After Martinez' death, Cruz confronted Martinez' boss, who repeatedly threatened her and stationed his criminal associates outside of Cruz' home. *See id.* at 125–26. Cruz fled to the United States, where she was detained and issued a Notice to Appear. When Cruz later claimed asylum, an IJ denied her petition, observing that her dispute with Martinez' boss was a dispute with a "private actor for personal reasons." *Id.* at 126–27. We reversed, relying on *Hernandez-Avalos* and concluding that the IJ, and subsequently the BIA, applied an "excessively narrow interpretation of the evidence relevant to the statutory nexus requirement" and that Cruz had satisfied her burden of proof by demonstrating that she

11

more likely than not was targeted "because of [her] relationship with her husband." *Id.* at 129–30.

Velasquez' case is inapposite. The dispute between Velasquez and Estrada was a private and purely personal dispute between grandmother and mother regarding D.A.E.V. Velasquez specifically testified to that fact. Unlike *Cruz* or *Hernandez-Avalos*, this case does not involve outside or non-familial actors engaged in persecution for non-personal reasons, such as gang recruitment or revenge. Rather, this case concerns solely a custody dispute between two relatives of the same child and necessarily invokes the type of personal dispute falling outside the scope of asylum protection. *See Huaman-Cornelio*, 979 F.2d at 1000; *Jun Ying Wang*, 445 F.3d at 998–99.

For all these reasons, Velasquez did not meet her burden of showing persecution "on account of" a protected ground.

C.

Velasquez spends considerable time in her petition for review trying to shift the factual basis of her claim from that presented to the IJ and BIA in order to align more to the facts of *Hernandez-Avalos*. She speculates without proof that Estrada's persecution was part of a larger scheme orchestrated by the gang Mara Salvatrucha, commonly known in the United States as MS-13. According to Velasquez, both Estrada and Oscar have some connection to MS-13, and Estrada's effort to take custody over D.A.E.V. really was an effort to recruit him into the gang. As evidence of this recent theory, Velasquez contends that Oscar, who killed her sister, is an active member of MS-13; that after the murder, Oscar spray-painted a death threat on her home and signed it "M.S.,"

12

A.R. 150; and that Estrada "g[a]ve[] [MS-13 members] food," A.R. 419. But none of these "facts" establishes a relevant nexus to a third party persecuting the victim on account of their particular social group. In particular, there is no evidence in the record that Estrada's interest in her grandson had any connection of any kind to gang recruitment or any gang involvement. Instead, it is a late conjured theory devoid of record evidence of any connection to a particular social group.

As an initial matter, it is not clear that we have jurisdiction over Velasquez' claim insofar as she asserts that MS-13, not Estrada, was the source of her persecution. "[A]n alien who does not raise a particular claim before the [Board] fails to exhaust [her] administrative remedies as to that claim," leaving the federal courts without jurisdiction to consider it. *Tiscareno-Garcia v. Holder*, 780 F.3d 205, 210 (4th Cir. 2015). The record contains only passing references to gangs generally, and MS-13 particularly. In Velasquez' application for asylum, she mentions as a matter-of-fact "Oscar is often with members of the MS gang." A.R. 250. Yet she offered nothing else to tie Estrada's actions to a gang, and stated that she did not "know if [Estrada] is associated with the MS." *Id.* None of her arguments to the IJ or the Board asserted that she was being persecuted by a gang or that affected her or D.A.E.V. in any way.

But even if we do have jurisdiction, substantial evidence supports the IJ's conclusion, affirmed by the Board, that Velasquez was persecuted by Estrada, not by MS-13, and that this persecution was solely personal. Velasquez' petition confirms the deeply personal nature of her conflict with Estrada, attributing Estrada's threats to the fact that that she "never liked [Velasquez] very much," not to a gang-related motive.

13

A.R. 249. Again, when asked directly about the source of her persecution before the IJ, Velasquez explicitly confirmed that no one "outside of [the Velasquez and Estrada] families [were] involved in this disagreement." A.R. 165. Accordingly, we hold that the IJ's conclusion, adopted by the Board, that the dispute between Velasquez and Estrada was solely a personal dispute was supported by substantial evidence.

****

In sum, the IJ did not err in concluding that the dispute between Velasquez and Estrada was not "on account of" Velasquez' membership in a particular social group, but was simply a personal dispute. As such, Velasquez failed to meet her burden of proof as to an essential element of her asylum claim: that her persecution arose "on account of membership in a particular social group." Therefore, we deny Velasquez' petition for review.[6]

## IV.

Based on the foregoing, Velasquez' petition for review of the Board's decision dismissing her petition for asylum and withholding of removal is denied.

*PETITION DENIED*

---

[6] Velasquez also applied for withholding of removal under section 241(b)(3) of the INA. *See generally* 8 U.S.C. § 1231(b)(3). That statute provides that the Attorney General cannot "remove an alien to a country if [he] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1231(b)(3)(A). "[A]n applicant who is ineligible for asylum is necessarily ineligible for withholding of removal." *Camara*, 378 F.3d at 367. Given the above discussion, Velasquez necessarily did not meet the higher burden for withholding of removal. Accordingly, we also deny Velasquez' petition for withholding of removal.

14

WILKINSON, Circuit Judge, concurring:

I am happy to concur in Judge Agee's fine opinion for the court. I write briefly to emphasize the need for some outer boundary in the interpretation of the "particular social group" prong of the asylum statute. 8 U.S.C § 1101(a)(42)(A).

In *Matter of L-E-A-*, the Board of Immigration Appeals ("BIA") emphasized that "the fact that a persecutor has threatened an applicant and members of his family does not necessarily mean that the threats were motivated by family ties." 27 I. & N. Dec. 40, 45 (BIA 2017). "[N]exus is not established simply because a particular social group of family members exists and the family members experience harm." *Id.* Moreover, "the fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground." *Id.* If inflicting harm on family members is not an independent end, perpetuated "because of an animus against the family," then we must look to "the reasons that generate the dispute." *Id.* at 44–45. "[T]he scope of the motive inquiry necessarily encompasses the context in which a family member is identified for harm and how that relates to the interest in the applicant." *Id.* at 46 n.5.

The analysis of "particular social group" in the asylum statute is at risk of lacking rigor. I understand that many of the alleged persecutions present heart-rending situations, and I respect the impulse, shared by us all, simply to do something to help someone out. The protected characteristics, 8 U.S.C § 1101(a)(42)(A), however, are for the most part precisely defined. Had Congress intended "membership in a particular social group" to be some omnibus catch-all, it would be odd to find its placement not at the end of a series,

15

but sandwiched between more sharply etched criteria. I fear judicial interpretations of this statute may outstrip anything Congress intended.

To extend the concept of persecution on account of a "particular social group" to the kind of intra-familial disputes at issue here would, as Judge Agee notes, render the asylum statute unrecognizable. The concept of a "particular social group" must be understood in the context of the other statutory grounds for asylum protection. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 230 ("Consistent with the interpretive canon '*ejusdem generis*,' the proper interpretation of the phrase can only be achieved when it is compared with the other enumerated grounds of persecution (race, religion, nationality, and political opinion), and when it is considered within the overall framework of refugee protection."). None of the other statutory grounds for asylum creates protected classes of only two or three people. To the contrary, asylum was intended to protect specific segments of the population who are marginalized or subjected to social stigma and prejudice. Families, of course, may suffer hardships, but they are less likely candidates for the kind of targeted racial, ethnic, religious, and political prejudice with which the asylum statute is chiefly concerned.

Moreover, particularity requires "a clear benchmark for determining who falls within the group," *Matter of M-E-V-G-*, 26 I. & N. Dec. at 239. In other words, a proposed social group must be "described in sufficiently distinct terms that it would be recognized, in the society in question, as a discrete class of persons." *Matter of W-G-R-*, 26 I. & N. Dec. at 214 (internal quotation marks omitted). Particular social groups cannot

be "amorphous, overbroad, diffuse, or subjective." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238.

Victims of general extortion and domestic violence that is not unique to any family but rather that "affects all segments of the population" are nonetheless seizing upon the "particular social group" criterion in asylum applications. *Matter of S-E-G-*, 24 I. & N. Dec. 579, 587 (BIA 2008). The example of gang violence is illustrative. Petitioners are often not "exposed to more violence or human rights violations than other segments of society," and "not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests." *Id.* The BIA has previously explained that "victims of gang violence come from all segments of society, and it is difficult to conclude that any 'group,' as actually perceived by the criminal gangs, is much narrower than the general population." *Id.* at 588; *see Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 250 (BIA 2014) ("Against the backdrop of widespread gang violence affecting vast segments of the country's population, the applicant in *Matter of S-E-G-* could not establish that he had been targeted on a protected basis. Although he was subjected to one of the many different criminal activities that the gang used to sustain its criminal enterprise, he did not demonstrate that he was more likely to be persecuted by the gang on account of a protected ground than was any other member of the society." (citations omitted)). It is difficult to establish the necessary causation when so many persons outside the particular social group experience identical persecution for the same overarching reasons. The pervasive nature of the persecution threatened in these cases suggests that family membership is often not a central reason for the threats

received, but rather is secondary to a grander pattern of criminal extortion that pervades petitioners' societies.

The asylum statute is not a general hardship statute. It was not at all drafted in that way. It is crucial to remember that the statute is but one provision in a larger web of immigration laws designed to address individuals in many different circumstances. To expand that statute beyond its obviously intended focus is to distort the entire immigration framework. There is often no evidence that "persecutors had any animus against the family or the [applicant] based on their biological ties, historical status, or other features unique to that family unit." *Matter of L-E-A-*, 27 I. & N. Dec. at 47. Persecutors are seeking money, power, and control. Alleged persecution on account of family membership, distressing though it may be, is often nothing more than a manifestation of the general extortion and gang violence that plagues El Salvador. I again do not attempt to minimize the magnitude of human suffering that these conditions cause. But to broaden the statutory grounds for relief from those conditions must by definition be a congressional rather than a judicial enterprise.